IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:07-CR-25-F

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | **MEMORANDUM & RECOMMENDATION** |
| ) | |
| ) | |
| MICHAEL AUGUSTUS COMSTOCK, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on Defendant Michael Augustus Comstock's motion to suppress statements he made and evidence seized from his home, based on an alleged lack of probable cause for the seizure, failure timely to give Miranda rights, and search warrant deficiencies. [DE-23]. The government has responded, [DE-28], and the court held an evidentiary hearing on March 11, 2008, to develop the record. At the March 11, 2008 hearing, the court heard testimony from three witnesses, Sergeant Terry Mark Cagle, and Officer Michael Wayne, both with the North Carolina Wildlife Resources Commission, and Agent Chad Munn, with the Bureau of Alcohol Tobacco and Firearms. Accordingly, this matter is ripe for review.

## STATEMENT OF THE FACTS

Comstock was indicted for being a felon in possession of a firearm on November 14, 2007. [DE-1]. He filed the instant motion to suppress due to circumstances surrounding his arrest and the search of his home.

1

A.  Sergeant Cagle

The government's first witness was Sergeant Cagle. He testified to the following facts: He has been employed by the North Carolina Wildlife Resources Commission since 1997 and is charged with enforcing hunting, boating and fishing laws in the state. He has extensive experience in investigating hunting violations dealing with bears and bear baiting. The Wildlife Resources Commission focused its investigation on Comstock because a confidential informant told officers that Comstock was involved in baiting and hunting bears out of season. The confidential informant told Sergeant Cagle that Comstock had killed bears during the closed season on approximately 30 or 40 occasions. In addition, the confidential informant provided information regarding the location of Comstock's bait sites. Finally, the officers knew that Comstock had a history of wildlife violations. Based on this information, Sergeant Cagle conducted surveillance of Comstock and the bait sites identified by the confidential informant throughout April 2007. During the surveillance, he never saw Comstock visit any of the bait sites or carry a weapon.

On May 1, 2007, Sergeant Cagle along with Officer Robert Michael Wayne, conducted surveillance of a bait site in a heavily wooded area near a swamp about 500 yards from Comstock's home. Another member of his team was at a different location in the woods at some distance from the bait site. At the bait site, there were numerous 55 gallon drums, bear tracks and bear skat. Two drums had holes cut into them, were chained to a tree, and had peppermint candies and bubble gum in them. A third cardboard container had peanut butter in it. These types of bait, in Sergeant Cagle's experience, are used to attract bears.

On the morning of May 1, 2007, Sergeant Cagle went to the bait site between 4:00

and 5:00 am. At around 6:00 am, he heard a truck drive to within 15 yards of the bait site, and Comstock released dogs from the back of his truck. The dogs started running and Comstock started talking on a two-way radio about a particular dog to other members of Comstock's party who were located in another area of the forest. Comstock then walked off, following the dogs. Shortly thereafter he returned to his truck and drove off. Sergeant Cagle could hear the dogs continuously moving in the woods. When the dogs got to a certain location, the sound of their bark changed and intensified, which was consistent, in his experience, with the dogs cornering an animal, or "barking treed." The dogs seemed to stay in one location for about twenty minutes, based on the sound of their barking. Then he heard a gunshot, the dogs continued barking for about thirty seconds, and then they went silent.

After that Sergeant Cagle went down a path toward Comstock's home to Comstock's dog pen area, and concealed himself. Comstock returned first, walked down to the dog pen and started tracking a dog with a tracking wand. Then other vehicles started returning to the house and people were milling around. Sergeant Cagle was communicating with Officer Wayne, who was also hiding near the dog pens, and they made a plan to confront the subjects. Just prior to stepping out of the woods, a blue truck–which was not Comstock's truck–was driven off the premises.

Sergeant Cagle came out of the woods first. He had his weapon out of its holster but down by his leg. He stated forcefully the he was a wildlife officer and needed to see everyone's hands. There were three individuals outside of Comstock's house but Comstock was not among them. He asked the three people that were near Comstock's house to sit down. One individual, who has an amputated leg, had to use a tree to lower

3

Case 2:07-cr-00025-F   Document 38   Filed 04/18/08   Page 3 of 14

himself to the ground.

While Sergeant Cagle was separating the three individuals, the blue truck returned. Sergeant Cagle approached the truck on the driver side and saw that Comstock was driving. Officer Wayne approached on the passenger side. Sergeant Cagle had his weapon drawn. He told Comstock that he was a state wildlife officer and that Comstock needed to step out of the truck. Sergeant Cagle also asked if Comstock had any weapons on him. Comstock said no. Sergeant Cagle then asked Comstock if there were weapons in the truck, and Defendant answered that there could be, but he did not know. Sergeant Cagle also asked if any weapon in the truck was loaded and Comstock responded that he did not know. Upon a search of the truck, Sergeant Cagle found a Remington 870 shotgun.

Sergeant Cagle said that he asked Comstock questions about the gun for safety reasons. Later Comstock was read his <u>Miranda</u> rights and interviewed. Comstock stated that his dogs were chasing a coyote and that after returning to the house, he drove a truck owned by another member of his party to lock a gate at the end of his property. Comstock told Sergeant Cagle that the only time he had been in the truck was when he drove it for a few minutes to lock the gate. He stated that while driving, a lock fell in the back of the truck and he reached back for the lock, which is the only time that he might have touched the gun.

Sergeant Cagle stated that he had seen no evidence of weapons or game when the officers detained Defendant and the other members of his party.

B.   <u>Agent Chad Munn</u>

Next, Agent Chad Munn testified. He stated that he is employed with the Bureau of Alcohol, Tobacco and Firearms and helped prepare the search warrant in this case. He

4

reviewed the search warrant and affidavit and believed all the information contained in the documents to be true.

Agent Munn stated that he believed there to be probable cause to search Comstock's home because the confidential informant that provided information about Comstock had provided accurate information on numerous occasions in the past. The confidential informant had provided information about where Comstock's bait sites were located, and the types of firearms that Comstock owned and their location. During the course of the investigation, the confidential informant also told wildlife officers that Comstock had moved guns from his house to his nephews home to avoid having them found and seized. Agent Munn stated that even though the officers had information to suggest that Comstock had previously moved firearms from his house, he stated the officers were looking for evidence other than firearms. For instance, they were looking for ammunition, receipts for firearms, gun cleaning kits, and other firearm-related evidence. He stated that there was no evidence to indicate that firearm-related evidence had also been removed from the home in addition to the firearms themselves, prior to the execution of the warrant.

Agent Munn stated that he did not attempt to corroborate some of the information that the confidential informant provided until after the search warrant had been executed.

C. <u>Officer Robert Michael Wayne</u>

Finally, Officer Robert Wayne testified to the following facts. He has been a wildlife officer with the North Carolina Wildlife Resources Commission since 1997. He was involved in the surveillance of the bait site on May 1, 2007, and was with Sergeant Cagle. There were a number of 55 gallon drums at the bait site, two were chained to a tree and

5

Case 2:07-cr-00025-F   Document 38   Filed 04/18/08   Page 5 of 14

filled with peppermint and bubble gum. In addition, there was a container with peanut butter. He had seen this type of bait used to bait bears before, but had not seen it used to bait other animals. There was evidence of bears at the bait site, including, bear tracks in the sand, bear skat, and heavy bear trails.

Officer Wayne stated that he and Sergeant Cagle were set up about 40 yards from the bait site. He saw Comstock's truck arrive at the bait site at around 6:00 am and Comstock let his dogs go. He heard Comstock talk on the radio about a particular dog. After about five minutes he went back to his truck and drove away. Officer Wayne heard the dogs moving away, and then heard them barking loudly. Shortly after that, he heard a gunshot, then the dogs continued to bark for a few seconds and went quiet. He assumed a bear was shot, although he did not see the animal get shot. When Defendant came back to the property Officer Wayne was hiding behind the dog pens. Defendant had a wand and was trying to locate a dog; then Comstock left again.

At approximately 7:25 am, all the vehicles from Defendant's party returned to his home. Right before Officer Wayne and Sergeant Cagle stepped out of the woods and revealed themselves, a truck left Comstock's house. When Officer Wayne stepped out of the woods, he stated that he was a state wildlife officer and had his weapon drawn by his leg. He ordered the three people there to sit on the ground. After about five or ten minutes, the truck that had left came back. He went to the passenger side of the truck to talk to the occupant while Sergeant Cagle went to the drivers side of the truck. He asked the person to get out of the truck and had his gun at his side.

Officer Wayne did not see anyone with a gun and never heard anyone talking about shooting. He did not find any firearms, other than the one recovered from the truck, on the

6

Case 2:07-cr-00025-F   Document 38   Filed 04/18/08   Page 6 of 14

individuals or in their vehicles, and he saw no evidence in the trucks that an animal had been taken.

**DISCUSSION**

Comstock is charged with one count of possession of a firearm by a convicted felon in violation of Title 18, United States Code, sections 922(g)(1) and 924. In his motion to suppress, Comstock claims (1) that he was seized during the May 1, 2007 interrogation without probable cause and therefore, statements that he made and evidence found should be suppressed, (2) that the wildlife officers violated his Fifth Amendment rights because they asked him about a possible weapon before reading him his Miranda rights, and (3) that the search warrant of his house was invalid because it lacked probable cause.[1] It is the court's opinion, however, that Comstock's constitutional rights were not violated.

A.    Probable Cause Existed for the Detention

Comstock argues that the wildlife officers did not have probable cause to seize and detain him on May 1, 2007.[2] After he was ordered to leave the truck, he was asked to sit on the ground and was later interrogated by the wildlife officers. Defendant was in custody for approximately five hours.

---

[1] Comstock also argued in his motion to suppress that the officers conducted an improper search because the bait site was within the curtilage of his home. See United States v. Breza, 308 F.3d 420, 435 (4th Cir. 2002) (noting that a person has an expectation of privacy in areas that are "within the curtilage of the home"). However, at the March 11, 2008 hearing, his counsel admitted that the bait site, located approximately 475 yards from Comstock's home in a densely wooded area, was not within the curtilage of his home. Accordingly, the court will not address this issue further.

[2] The government does not contest that Comstock was placed in custody during his interrogation.

In order to determine whether probable cause existed for Comstock's detention, the court must look at the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 230-32 (1983); Taylor v. Waters, 81 F.3d 429, 434 (4th Cir. 1996). "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002). Accordingly, "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." Hill v. California, 401 U.S. 797, 804 (1971). Assessing whether an officer's information surrounding a detention is sufficient to establish probable cause is an individualized and fact-specific inquiry. Wong Sun v. United States, 371 U.S. 471, 479 (1963). Additionally, an officer may rely on his or her experience and specialized training to make inferences from and deductions about the evidence available. United States v. Arvizu, 534 U.S. 266, 273 (2002).

Accordingly, the court must determine whether the wildlife officers had a reasonable belief that an offense had been or was being committed. Under North Carolina law, a person may not "unlawfully take . . . any bear." N.C. Stat. Ann. § 113-294. In addition, the statute defines "to take" as "all operations during, immediately preparatory, and immediatly subsequent to an attempt, whether successful or not, to capture, kill, pursue, hunt, or otherwise harm or reduce to possession any . . . wildlife resources." N.C. Stat. Ann. § 113-130(7). Because bear season was not open on May 1, 2008, any attempt to take a bear on that date would have been unlawful. N.C. Stat. Ann. § 113-291.1.

The information that the officers had on May 1, 2008 was as follows. A confidential informant had told them that Comstock had killed bears out of season on numerous other

8

occasions. Officers Cagle and Wayne saw the bait site. The bait site contained 55 gallon drums chained to a tree and filled with bubble gum and peppermints. In addition, another container was filled with peanut butter. The officers testified that they had seen that type of bait used to lure bears, but not other animals. In addition, Officer Wayne testified that the bait site had bear tracks in the sand, bear skat and bear trails leading to the bait. On May 1, 2008, the officers saw Comstock release his dogs at the bait site, the dogs ran off, and Comstock got back in his truck. The officers heard the dogs move away from the bait site, then the dogs started barking in a frenzied way, which the officers recognized as the sound of dogs cornering an animal or "barking treed." Next they heard a gun shot, the dogs continued to bark for a short time, and then stopped. Both Sergeant Cagle and Officer Wayne stated that in their experience as wildlife officers, based on the evidence at the bait site, they assumed that a bear had been shot.

Comstock asserts that probable cause was lacking because during their surveillance in April, the officers never saw him frequent any of the bait sites identified by the confidential informant, they never saw him with a weapon, and they never saw him with illegally caught game. Although the officers' surveillance throughout April did not reveal any criminal conduct on the part of Comstock, the information that the officers had on May 1, 2007, was sufficient to provide probable cause. The officers were at the bait site when Comstock released his dogs at the site, they heard the dogs move off, the saw Comstock leave, they heard the dogs and then their barking intensify, they heard a gun shot, and they heard the dogs stop barking, then they saw everyone come back to Comstock's house. Accordingly, it is the court's opinion that the officers had probable cause to believe that Comstock had engaged in the illegal act of baiting and killing a bear out of season.

9

B.  No Violation of Miranda Rights

Next, Comstock argues that his constitutional rights were violated because Officer Cagle asked questions about a possible weapon in the truck before reading him his Miranda rights. Specifically, after Officer Cagle asked Comstock to step out of the truck he asked Comstock if there was a gun in the truck, what kind of gun was in the truck and whether it was loaded. That was the extent of the questioning that occurred before Comstock was read his Miranda rights.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court established procedural safeguards to support an individual's Fifth Amendment right against self incrimination. The Court concluded that before police officers could engage in a custodial interrogation, they must advise the individual of his or her Miranda rights, which include the right to remain silent and the right to have a lawyer present. Id. However, in some instances an officer is not required to alert a suspect of his or her Miranda rights before asking particular questions. One such instance is the public safety exception, which allows an officer to ask a suspect specific questions when there is a potential danger to the public or the officer. New York v. Quarles, 467 U.S. 649, 655-56 (1984). In Quarles, the police had reason to believe that an armed man who had raped a woman was in a grocery store. Id. at 657. The police apprehended the man in the store, but his gun holster was empty, and an officer asked where the suspect had put the gun before reading him his Miranda rights. The Supreme Court held that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." Id. In addition, "the exception applies no only to protect the public safety but also police safety as well." United States

v. Mobley, 40 F. 3d 688, 692 (4th Cir. 1994).

In this case, the wildlife officers believed that a firearm had been fired. They also knew that Comstock had a prior criminal record. It is the court's opinion that the questions asked were meant to secure the safety of the officers and did not exceed the bounds of the "public safety" exception.

C. Search Warrant was Valid

Finally, Comstock argues that a search warrant issued in this case lacked probable cause. He argues that the officer's affidavit accompanying the warrant relied heavily on information provided by a confidential informant, but there was no evidence provided that the confidential informant was credible or reliable. In addition, the officer's affidavit states that the confidential informant told an officer that Comstock had removed all of his firearms from his house, so the warrant does not suggest that evidence of a crime would be found on Comstock's property.

In order for probable cause to exist in the context of a search warrant, there must be "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "Probable cause may be founded on hearsay and information received from informants." United States v. DeQuasie, 373 F.3d 509, 518 (4th Cir. 2004). Accordingly, when reviewing a warrant for probable cause a magistrate judge should consider the totality of the circumstances and must consider the basis for the confidential informant's knowledge. Gates, 462 U.S. at 238. Nonetheless, "there is no set requirement that all tips be corroborated by subsequent police investigation in order to be considered credible." DeQuasie, 373 F.3d at 519 (internal quotation marks omitted).

11

Here, the affidavit states that the confidential informant had been providing information to law enforcement since May 2007, the confidential informant told officers that Comstock was illegal baiting and killing bears and described the bait sites. In addition, the confidential informant was one of the people at Comstock's house on May 1, 2007. The affidavit notes that the confidential informant told officers that Comstock killed a bear on May 1, 2007 and confirmed the location of the kill site, where officers located a dead bear, from video and pictures. In addition, the confidential informant told officers that he knew where Comstock's guns were located. Because the confidential informant was dealing with the wildlife officers directly, and because his statements to the officers were based on personal observation, there was sufficient indicia of reliability. United States v. Perez, 393 F.3d 457, 462 (4th Cir. 2004) (noting that when a confidential informant is a known witness and has first-hand knowledge of the information provided, then the magistrate had reason to concluded that an affidavit was supported by probable cause based on the information provided by the confidential informant). Accordingly, it is the court's opinion that the warrant provided sufficient information for the magistrate judge to have concluded that the confidential informant was reliable.

In addition, Comstock argues that if the confidential informant was reliable, then the warrant should never have been issued because the confidential informant told wildlife officers that Comstock had removed all of the guns from his house. However, Agent Munn stated in the affidavit that they were looking for more than firearms; they were also looking for firearm-related evidence, such as sales receipts, factory warranties, and canceled checks for firearms, gun cases, ammunition, and gun cleaning supplies. The confidential informant did not suggest that Comstock had removed from his home any firearm-related

12

evidence that he might have had.

The affidavit sets forth that Comstock is a convicted felon and also describes the events that took place on May 1, 2007. In addition, the affidavit states that a confidential informant knew that Comstock had many firearms in his house on May 1, 2007, the type of firearms that Comstock owned, and where the firearms were supposedly moved. Accordingly, it is the court's opinion that the affidavit accompanying the search warrant was sufficient to establish "a fair probability that contraband or evidence of a crime" would be found on Comstock's property.

## CONCLUSION

For the reasons set forth above, the court **RECOMMENDS** that Defendant's Motion to Suppress be **DENIED** [DE-23]. The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the

District Court.

       This the 18th day of April, 2008.

                                /s/ David W. Daniel
                       _____

                       DAVID W. DANIEL

                       United States Magistrate Judge